

**ORDERED in the Southern District of Florida on December 11, 2014.**

**TAGGED OPINION**

Laurel M. Isicoff, Judge
United States Bankruptcy Court

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

FABRIZIO DULCETTI NEVES

      Neves.

_____/

MARKWOOD INVESTMENTS LTD.
and GOLDEN DAWN CORPORATION,

      Plaintiffs,

v.

FABRIZIO DULCETTI NEVES,

      Defendant.

_____/

Case No. 09-33043-BKC-LMI
Chapter 7

Adv. Pro. No. 10-02122-LMI

## <u>MEMORANDUM OPINION ON TRIAL[1]</u>

---

[1]This Opinion constitutes my findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.  While I believe the issue of my jurisdiction has been dealt with exhaustively by me and by the District Court through various appeals and otherwise, to the extent that it is somehow determined that I do not have jurisdiction to render final judgment in this matter, the following constitute my proposed findings of fact and conclusions of law under 28 U.S.C. §157(c).

This matter came before me for trial on February 24, 25, 26, 27, and 28, 2014.  For the reasons stated below, judgment will be entered for the Plaintiffs on Counts II, III, IV and V of the Fourth Amended Complaint and judgment will be entered for Defendant on Counts I and VI.

## PROCEDURAL BACKGROUND

The procedural background of this adversary proceeding, up through October 18, 2013, is detailed in this Court's Order Granting Plaintiffs' Motion to Strike Defendant's Demand for Jury Trial.[2]  In this Opinion, I will only repeat or add such procedural details as are necessary to set the context for this Opinion.

Debtor/Defendant ("Neves") filed his voluntary petition for bankruptcy under Chapter 7 on October 23, 2009.  On January, 2010, the Plaintiffs—Golden Dawn Corporation ("Golden Dawn"), a Panamanian company, and Markwood Investments Ltd. ("Markwood"), a British Virgin Islands corporation )—filed this adversary proceeding.[3]

On December 16, 2010, Neves filed his Voluntary Waiver of Discharge.[4]  On January 27, 2011, the Court denied of the Debtor's Second Motion to Dismiss[5] and approved Neves' Voluntary Waiver of Discharge,[6] which rendered the Plaintiffs' section 523 claims moot, ultimately giving rise to the Fourth Amended Complaint (the "Complaint").[7]

The Complaint seeks recovery on the following grounds: Count I – Fraud alleging Neves obtained $20 million from Markwood by false material misrepresentations, material omissions

---

[2] ECF #729.
[3] I use the term the "Plaintiffs" to refer to Markwood, Golden Dawn, or both, as the parties themselves conflate the entities in many of their pleadings and arguments. So for purposes of this Memorandum Opinion, I will refer to the parties collectively as the "Plaintiffs" in some instances where it would appear only one of the Plaintiffs has a particular claim.
[4] ECF #324, main proceeding.
[5] ECF #265.
[6] ECF #335, main proceeding.
[7] ECF #419. All references to the Complaint shall refer to the Fourth Amended Complaint unless otherwise stated.

and implied misrepresentations; Count II – Action on the Consolidated Note seeking payment of a principal balance of $4,430,000 and accrued interest of $2,113,674.26; Count III – Reestablishment of the Second Note, which note the Plaintiffs cannot locate; Count IV – Reformation of the Second Note  requesting that certain release provisions in the Second Note be stricken as scrivener's errors; Count V – Action on the Second Note seeking payment of a principal balance of $3,000,000 and accrued interest of $1,339,226.56; Count VI – Action on the Third Note, seeking payment of a principal balance of $2,650,000 and accrued interest of $407,827.49.  Neves ultimately filed his Answer on February 13, 2012, asserting 21 affirmative defenses.

After a great deal more procedural wrangling, including requests by the Plaintiffs to take a *de bene esse* deposition of their principal, Salvatore Frieri, and when that relief was denied, to allow Frieri to appear at the trial by videoconference from Italy,[8] the parties proceeded to trial on the Complaint.

As required by the Joint Scheduling Order dated September 12, 2013,[9] the parties entered into a Joint Pretrial Order[10] on February 22, 2014, outlining all facts and issues to be litigated at trial.[11]  The Joint Pretrial Order also included facts that the Plaintiffs argued should be litigated, to which Neves objected, arguing that the facts were not alleged in the Complaint and therefore could not be proven at trial.  Accordingly, during trial, Neves raised a "Rule 15" objection to a significant portion of the evidence that the Plaintiffs presented.

---

[8] My oral rulings on each of these motions have been converted into a written opinion that has been issued at the same time as this Opinion.
[9] ECF #722.
[10] ECF #917.
[11] At one of the hearings on pre-trial matters, I asked the Defendant to review all of the affirmative defenses that had been raised and to advise me by a date certain which, if any, affirmative defenses were not going to be pursued by the Defendant.  The response was included in the Joint Pretrial Order (ECF #917).

Subsequent to the trial, the Plaintiffs filed a motion to amend the Complaint to add a separate count for conspiracy and to plead relief based on additional facts,[12] to which motion Neves filed an objection.[13]    Finally, Neves filed a Motion on Partial Findings.[14]    This Memorandum Opinion includes my ruling on all pending motions as well as on the trial.

### FACTS

Neves, a licensed securities broker, was the owner of Acosta Realty Holdings, LLC, ("Acosta Realty") and allegedly acquired a controlling interest in a Miami-based broker-dealer, LatAm, Investments, LLC ("LatAm"), originally known as Acosta Financial Services, LLC, ("Acosta Financial").[15]    Neves worked at LatAm with Maximino "Jimmy" Acosta ("Acosta") and Angelica Aguilera ("Aguilera"), as well as an assistant/operations manager, Jose "Lucho" Luna ("Luna").  Plaintiff, Markwood, maintained a brokerage account at LatAm from early 2006 to sometime after 2007.  Mr. Salvatore Frieri ("Frieri") and his brother Arturo Rafael Frieri Gallo ("Arturo Frieri") are the sole equity holders of both Markwood and Golden Dawn.

Frieri and Neves had a relationship.  Frieri would come to LatAm and observe Neves doing trade deals.  Frieri and Neves also had a personal friendship.  Beginning in 2006, Neves directly and indirectly borrowed money from Frieri through Markwood and Golden Dawn.  The first of the loan transactions involves a promissory note dated September 5, 2006, in the principal amount of $500,000, executed by Acosta Realty as maker and Golden Dawn as payee (the "First Underlying Note").

---

[12] ECF #952, referred to throughout the Opinion as the "Rule 15 Motion."
[13] ECF #960.
[14] ECF #974.
[15] Whether Neves is the owner or only in control of LatAm is a matter that did not need to be resolved at this trial, and, by agreement of the parties, I did not resolve at trial, as this particular issue  is currently the subject of litigation between Neves and the chapter 7 trustee, Joel Tabas.

Soon after, Acosta Realty gave Golden Dawn a promissory note dated October 16, 2006 for $200,000, with Acosta Realty as the maker and Golden Dawn as the payee (the "Second Underlying Note"). Neves and his wife, Laura Neves, gave Golden Dawn a promissory note dated October 17, 2006 for $2 million identifying Mr. and Mrs. Neves as the makers and Golden Dawn as the payee (the "Third Underlying Note"). The First, Second, and Third Underlying Note shall be collectively referred to as the "Underlying Notes." On December 15, 2006 Acosta Realty and Neves as co-makers executed a promissory note in favor of Golden Dawn as payee in the principal amount of $4.43 million (the "Consolidated Note"). The Underlying Notes were consolidated in, and replaced by, the Consolidated Note. In addition to consolidating the Underlying Notes, an additional $1.5 million loan was extended and the principal amount of the Consolidated Note includes that advance. The interest rate reflected on the face of the Consolidated Note is 10% per annum, increasing to 15% upon default. On the same day that the Consolidated Note was signed, Frieri delivered an executed general release in favor of Neves.

Acosta Realty and Neves executed another promissory note in favor of Golden Dawn on February 5, 2007, in the principal amount of $3 million (the "February Note"). The Plaintiffs allege that the original copy of the February Note is lost.

On May 1, 2007, Acosta Realty executed a final promissory note in favor of Markwood, in the principal amount of $2.65 million (the "Third Note"). None of the Consolidated Note, the February Note or the Third Note has been repaid.

Plaintiffs' fraud claim is based on allegations that Neves masterminded a scheme through which Markwood was tricked into wiring $20 million to a Panamanian broker-dealer, Emerging Capital Group ("ECG"), in which the Plaintiffs claim Neves has an interest. The Plaintiffs allege that Neves, Acosta, Luna, Aguilera, and several of their colleagues including Carlos Fuenmayor

("Fuenmayor") and Christian Lovera ("Lovera") of BancTrust & Co. a/k/a BancTrust Wealth Management, Inc. ("BancTrust"),[16] conspired to defraud Frieri, Markwood and Golden Dawn. The Complaint alleges that, as part of this fraudulent scheme, Aguilera had an intimate relationship with Frieri and that Neves pretended to be Frieri's friend, all for the purpose of luring Frieri in and gaining his trust. The Complaint also alleges that Neves created ECG, which was owned by Acosta, Aguilera's sister, Alicia, and Leandro Ecker - another Neves colleague, solely for the purpose of defrauding Frieri, Markwood and Golden Dawn. The Plaintiffs further alleged that Luna introduced Frieri to Fuenmayor and Lovera so that Frieri would invest in a Venezuelan bond deal through them. The deal involved bonds issued by Petroleos de Venezuela, S.A., referred to as "PDVSA" bonds. In connection with this bond deal, Markwood transferred $20,020,000 on April 3, 2007 and $12,094,600 on April 4, 2007 to entities identified by Fuenmayor and Lovera. About fifteen days after the funds were wired, Markwood received approximately $38 million, thus realizing a profit of about $5 million from the PDVSA deal. This April bond deal is referred to in the Complaint and throughout the trial as the "April Bait Transaction."

On September 11, 2007, upon the instructions of Fuenmayor and Lovera, and allegedly in connection with further PDVSA deals, Markwood wired $20 million to an HSBC/Panama account in the name of ECG. On September 25, 2007, ECG transferred $10 million out of ECG's HSBC/Panama bank account in four separate wire transfers. ECG transferred another $8.5 million from the $20 million to Acosta Realty's HSBC/Miami bank account in Miami, Florida, on October 5, 2007. Neves then wrote two checks: one for $1.3 million payable to

---

[16] Both are employees, and perhaps principals of, BancTrust & Co. (a/k/a BancTrust Wealth Management, Inc.), a Venezuelan broker-dealer.

Acosta individually and one for $700,000 payable to J & A Boynton Enterprises, LLC, of which Acosta is the sole member. None of the $20 million was ever returned to Markwood.

There are two threshold issues I must address prior to reviewing the evidence. The first is the framework under which the Plaintiffs may use, and rely on, the adverse inference arising from Neves' invocation of his Fifth Amendment right against self-incrimination. The second, which I will address later in this Opinion, is the Plaintiffs' Rule 15 Motion that seeks to amend the Complaint to add a separate count for conspiracy and additional allegations.

## PLEADING THE FIFTH AND THE ADVERSE INFERENCE

In two days of deposition testimony, and at trial, Neves elected to respond to each and every question by asserting his Fifth Amendment right against self-incrimination. When, in a civil proceeding, a party elects to assert his Fifth Amendment right, the adverse party is entitled to an adverse inference,[17] meaning an inference that, had the party testified, such testimony would not have been favorable to his claim or defense. *S.E.C. v. Monterosso,* 746 F. Supp. 2d 1253, 1262 (S.D. Fla. 2010).

To be entitled to an adverse inference, a plaintiff must present some evidence tending to prove its assertion that is independent of the defendant's refusal to testify. *See Nationwide Life Ins. Co. v. Richards*, 542 F.3d 903, 912 (9th Cir. 2008). The Plaintiffs and Neves disagree whether this independent evidence may be circumstantial or must independently support the plaintiff's case. The quality of the independent evidence has been indirectly addressed but the parties have not cited to, nor have I been able to find, a court that definitively qualifies the nature of the evidence.

---

[17] "[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a Civil cause.'" *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976) (citation omitted). *See Coquina Invs. v. TD Bank, N.A.*, 760 F. 3d 1300 (11th Cir. 2014).

As there are no cases directly on point,[18] I turn to two Eleventh Circuit cases for guidance. The first is the recently decided *Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300 (11th Cir. 2014). In *Coquina*, the Eleventh Circuit adopted the reasoning of the Second Circuit in *LiButti v. United States,* 107 F.3d 110, 125 (2d Cir. 1997),[19] to determine when and to what extent a non-party's assertion of the Fifth Amendment right will give rise to an adverse inference against a party. In considering the appellant's contention that the plaintiff, Coquina, should not have been allowed to ask the witness "questions that were not corroborated by independent evidence in the record," the Eleventh Circuit held that counsel may ask the witness asserting the Fifth Amendment protections any question so long as counsel has a good-faith basis to ask the question. *Coquina*, 760 F.3d at 1309, 1313. "A good-faith basis does not have to be 'definitive proof' . . . and may be based on inadmissible evidence. . .." *Id*. at 1313. Nonetheless, the court declined to determine whether, when the questioning party knows the witness will invoke his Fifth Amendment right, the use of leading questions is limited absent "other independently admissible evidence that corroborated [the leading questions]." *Id*. However, the court held that, in the case before it, most of the questions asked of the witness *were* supported by independent corroborating evidence and, therefore, the few questions that were not so supported constituted, at worst, harmless error. *Id*. at 1309 n. 8.

Neves relies on *Avirgan v. Hull*, 932 F.2d 1572  (11th Cir. 1991),[20] a case in which the Eleventh Circuit considered whether, in support of a motion for summary judgment, the moving parties could rely solely on the assertions of Fifth Amendment privilege by various defendants. The court rejected this argument noting that "[t]he negative inference, if any, to be drawn from

---

[18] Many cases analyze the "independent evidence" that gives rise to certain assumptions regarding how "good" the independent evidence must be, however, no case has directly addressed how tenuous the independent evidence can get.

[19] Plaintiffs relied upon *Libutti*. *See* Plaintiffs' Closing Argument at ECF #973, p. 25-26.

[20] *See* ECF #974, p. 2.

the assertion of the fifth amendment does not substitute for evidence needed to meet the burden of production." *Id.* at 1580.[21]

In reconciling the two cases, I find that the independent evidence relied upon by a party to support use of the negative inference against an opposing party must be independent, admissible evidence which, when taken together with the "unanswered" leading question, corroborates a finding that would be warranted if the answer to the leading question had been "yes." However, the independent evidence alone does not need to independently sustain a party's burden of proof; the adverse inference may be included in the evidence that weighs in favor of the burden of the party relying on the adverse inference. *See Cole v. Am. Capital Partners Ltd., Inc.,* No. 06-80525-CIV, 2008 WL 2986444, at *5 (S.D. Fla. Aug. 4, 2008).

The adverse inference may be used to establish a defendant's knowledge or intent, "of which his statements [would be] the best evidence." *RBS Citizens, NA v. M-59 Tel. Petroleum LLC,* No. 2:12-cv-11193, 2013 WL 4496248, at *5 (E.D. Mich. Aug. 21, 2013) (The court granted summary judgment in favor of the plaintiff in an action for fraud arising out of a check kiting scheme. The plaintiff provided unrebutted support in its summary judgment motion to establish the defendants' misrepresentations and plaintiff's reliance on those misrepresentations; the court held that the adverse inference drawn from the defendant's refusal to testify at deposition established the remaining elements of knowledge and intent). *See also S.E.C. v. Lyttle,* 538 F.3d 601, 604 (7th Cir. 2008) ("But the consequence of [the defendants'] refusal [to testify in a civil action] is that they cannot testify to their state of mind. Without such testimony to contradict the mountain of circumstantial evidence (circumstantial with regard to the

---

[21] The Eleventh Circuit cited to *United States v. Rylander*, 460 U.S. 752 (1983). In *Rylander*, the Supreme Court considered the weight to be given a party's assertion of the Fifth Amendment privilege in a civil contempt proceeding in connection with that party's obligations to meet certain evidence requirements (essentially the reverse situation of *Avirgan*).

defendants' inmost beliefs, at any rate) that the SEC presented, evidence reinforced by the inference (permissible in a civil case) of guilt from their refusal to testify . . . no reasonable jury could doubt that they had acted with scienter . . .").[22]  In sum, where a plaintiff has offered independent evidence tending to establish the defendant's fraudulent intent and the defendant has denied the court access to the only direct evidence of his intent by refusing to testify on Fifth Amendment grounds, the court may draw an adverse inference, adding to the weight of the plaintiff's evidence.

However, none of this means, as the Plaintiffs argue, that all of the evidence and all of Neves' unanswered questions can be lumped together without more precise reference to the independent evidence and to the relationship of that evidence to particular unanswered questions. It is within this framework that I will review the evidence and determine how and whether, when taken with particular unanswered questions relating to that evidence, the Plaintiffs have met their burden with respect to any particular issue in this case, including intent.

## THE THREE PROMISSORY NOTES

The Plaintiffs seek to enforce three promissory notes: (1) the Consolidated Note; (2) the February Note; and (3) the Third Note.  Prior to trial, I ruled that the Plaintiffs could not present evidence on the issue of whether Acosta Realty was Neves' alter ego, holding that the Complaint failed to adequately allege an alter ego theory of liability.  The Plaintiffs acknowledge in their closing argument that, in the absence of that evidence, they cannot seek recovery from Neves in

---

[22] Neves argues that the adverse influence should not be used when the party seeking the inference has other available sources for the same information.  In this case, Neves argues that Plaintiffs could have brought Lovera or Fuenmayor to testify, but did not.  While it is true that use of the adverse influence lies in a court's discretion (*S.E.C. v. Monterosso*, 746 F. Supp. 2d 1253, 1262 (S.D. Fla. 2010)), I find that this decision, especially when used in the context of a party's decision to "plead the fifth" as opposed to a nonparty witness invocation of the same right, does not rest on the adverse party's apparent option to provide the same evidence through other means.  If reliance on the adverse inference, together with the independent evidence, is not adequate to satisfy Plaintiffs' burden of proof, then that is Plaintiffs' risk in choosing not to call those witnesses or present other evidence.

this adversary proceeding on the Third Note.[23]  Thus, I will only address the Consolidated Note and the February Note.  Judgment is entered in favor of Neves on Count VI of the Complaint.

### A.    The Consolidated Note (Count II)

Once a plaintiff presents an original, uncanceled promissory note, the burden shifts to the payor to prove any defenses to payment.  *Cole Taylor Bank v. Shannon*, 772 So. 2d 546, 550 (Fla. 1st DCA 2000) ("Challenges to a promissory note, mature and regular on its face, or to the debt it represents, must be made by affirmative defenses").  The payor's burden of proof is by a preponderance of the evidence.  *Id*. at 551.

The Plaintiffs met their burden under Florida law by presenting the Consolidated Note, along with evidence that it remains unpaid.  Frieri testified (through his deposition) that the Consolidated Note was executed on December 15, 2006, and Neves stipulated that he executed the Consolidated Note between Acosta Realty and himself as makers in the principal amount of $4.43 million.  The evidence also shows that, except for one payment, Neves failed to make interest payments when due,[24] and failed to pay Golden Dawn the outstanding principal amount of $4.43 million on the maturity date of July 31, 2007.

---

[23] In their Closing, Plaintiffs made clear that they believe that they have met their burden of proof that the Third Note is enforceable against Acosta Realty, and, moreover, that they do not waive their assertion that Neves is liable for the amounts that he borrowed under the Third Note.  *See* ECF #973, p. 57-58.  I make no findings regarding the Third Note.

[24] Neves made only one $33,000 interest payment on the Consolidated Note on February 1, 2007.  This is significant for reasons I will discuss later in this Opinion.

### B.    Defenses to Enforcement of the Consolidated Note

Neves raised three defenses to payment of the Consolidated Note: usury, unclean hands, and release.  I will address the two tried defenses—usury and release.[25]

### i.    Usury

Neves claims the Consolidated Note is usurious and therefore not enforceable because: (1) the 10% interest on the face of the Consolidated Note was purportedly increased by an oral agreement, pursuant to which Neves was required to pay 5% of gross broker commission income earned at LatAm through his LatAm trades in any month during which he exceeded $1 million in gross commission income (the "Agreement"); and (2) the Underlying Notes were usurious, thus tainting the Consolidated Note with usury.

To establish criminal usury,[26] Neves must prove by clear and convincing evidence[27] that: (1) a loan, either express or implied; (2) an understanding between the lender and the borrower that the money must be repaid; (3) a greater rate of interest than is allowed by law; and (4) corrupt intent on the part of the lender to take more than the legal rate of interest for the use of the money loaned.  *See Dixon v. Sharp*, 276 So. 2d 817, 819 (Fla. 1973).[28]  Where, as here, the amount of the loan is over $500,000, the loan is usurious and unenforceable only if the interest rate is over 25% per annum simple interest.  *See* Fla. Stat. §§687.071(2), 687.02.  Corrupt intent is presumed when the interest rate is over 25%.  Corrupt intent is also shown if the evidence

---

[25] Neves' unclean hands defense was based on Neves' allegation that Frieri obtained the funds that were lost by defrauding other parties, or, as I described in my pretrial ruling on this defense—"you can't sue me for stealing money that you stole from someone else."  Because Neves could not cite any support for this factually appealing but otherwise unsupported argument, I granted Plaintiffs' Motion in Limine to Exclude Prior Bad Acts and Improper Character Evidence (*See* Transcript at ECF #922, p. 65-66).

[26] Criminal usury is the crime of charging higher interest on a loan than permitted by law, as defined by Fla. Stat. §687.071.

[27] *Dixon v. Sharp*, 276 So. 2d 817, 819 (Fla. 1973); *Davanzo v. Miami Nat'l Bank*, 301 So. 2d 797, 799 (Fla. 3d DCA 1974) ("the subject notes on their face are for legal rate of interest only and, therefore, appellant had the burden of proving that there was some corrupt device to cover usury and that it was in the full contemplation of the parties").

[28] The only testimony presented on this issue came from Frieri;  Neves asserted his Fifth Amendment right to remain silent on this and all other issues.

indicates that the lender knowingly *charged or received* excessive interest, considering all of the surrounding circumstances.  *Rollins v. Odom,* 519 So. 2d 652, 657-58 (Fla. 1st DCA 1988).

> ### a.    The oral agreement, even if part of the Consolidated Note, does not constitute interest.

Although the interest rate on the Consolidated Note is 10%, Neves argues that the Agreement by Neves to pay 5% of his gross commission income to Frieri when the income exceeded $1 million, caused the effective interest rate of the Consolidated Note to be over 69%. However, Neves has failed to prove that the Agreement altered the interest rate on the Consolidated Note.

The Third Underlying Note provided that, in addition to interest, Neves would pay Golden Dawn, "5% of gross commission income on [Neves'] production on Acosta Financial Services for a total of 31 months on those months where [Neves] exceeds gross commission income of 1,000,000.  The months where the commission income is less or equal to 1,000,000 will not count as part of the 31 months."  This provision was not included in the Consolidated Note;  however, there was some oral agreement regarding a "profit share" because, on February 1, 2007, Neves made an $83,000 payment to Golden Dawn, $50,000 of which was apparently pursuant to the Agreement—the balance was interest due on the Consolidated Note.

Nonetheless, even assuming the Agreement was enforceable, under Florida law, "[a] loan agreement is not usurious when payment depends upon a contingency."  *Kraft v. Mason*, 668 So. 2d 679, 684 (Fla. 4th DCA 1996) (citing *Bailey v. Harrington*, 462 So. 2d 861 (Fla. 3d DCA) *rev. denied* 472 So. 2d 1180 (Fla. 1985)).  *See also In re Transcapital Fin. Corp*., 433 B.R. 900, 908 (Bankr. S.D. Fla. 2010) ("The fact that repayment of the loan is contingent upon the result of the horse race renders the transaction non-usurious even though the lender stands to potentially earn a 50% return in a single day").  Where the lending party does not know at the outset the

13

total amount it will receive in return for the extension of credit, the ultimate amount received is not conclusive of corrupt intent. *Kraft*, 668 So. 2d at 684. *See also Velletri v. Dixon*, 44 So. 3d 187, 189 (Fla. 2d DCA 2010) ("Whether a transaction is either civilly or criminally usurious is determined at the inception of the loan").

The 5% gross commission payment was contingent because in any given month Neves might not earn enough in commissions to trigger the obligation at all, and even if the obligation were triggered, the specific amount due could not have been calculated at the time the Consolidated Note was executed. Thus, the contingent payments due under the Agreement, even if otherwise enforceable, are not included to calculate interest under the Consolidated Note.

### b.    The Consolidated Note purged any usury in the Underlying Notes.

Neves also argued that the Underlying Notes were usurious, and that even if the Consolidated Note was not on its face usurious, the taint of the three Underlying Notes was not cleansed by the consolidation. As I already held, the Consolidated Note is not usurious on its face: it reflects an outstanding principal of $4.43 million bearing an interest rate of 10% per annum. The Consolidated Note also superseded and canceled the previous loans—"[this Note] consolidates, cancels, replaces and supersedes all previous Notes between the undersigned parties including the [First Underlying Note, the Second Underlying Note, and the Third Underlying Note]."

Under Florida law, the usurious character of a transaction is established at its inception, and the taint of usury becomes a part of any new or substituted contract that does not purge the usurious character of the underlying transaction. *Rollins*, 519 So. 2d at 658. However, the Florida Supreme Court has held that if every element of usury in the first agreement is abandoned in a subsequent related agreement, and the borrower voluntarily agrees to fulfill the

subsequent agreement, that agreement is enforceable against a claim of usury. *Gunn Plumbing, Inc. v. Dania Bank*, 252 So. 2d 1, 3 (Fla. 1971); *see also Clark v. Grey*, 132 So. 832, 833 (Fla. 1931) ("The subsequent agreement between the parties eliminated the usurious element of the original contract, and, in effect, made a new contract between the parties which was in no wise usurious"). Accordingly, the illegal taint of an agreement can be "purged" by a reformation of the usurious agreement that expunges the usurious interest by the lender remitting the excess interest and retaining only lawful interest. *Clark*, 132 So. 2d at 834*; see also Rollins*, 519 So. 2d at 658.[29]

The plaintiff has "the burden of proving that there was some corrupt device to cover usury and that it was in the full contemplation of the parties." *Davanzo v. Miami Nat'l Bank*, 301 So. 2d 797, 799 (Fla. 3d DCA 1974). The Plaintiffs argue that the allegedly usurious nature of the underlying notes carried forward in the Consolidated Note. The record does not support this argument: even if the Underlying Notes were usurious, the parties entered into a new agreement that explicitly consolidated, canceled, replaced and superseded all previous loans between the parties, including the Underlying Notes. In addition to the plain terms of the Consolidated Note, Frieri testified that when the agreement on the Consolidated Note was reached, the interest rates on the Underlying Notes were abandoned and replaced with a 10% interest rate. Finally, Neves made one interest payment on the Consolidated Note, thereby "voluntarily fulfilling" his obligation under the new replacement instrument.

Thus, Neves has failed to establish a defense of usury.

### ii.    The December 15 Release

Neves has also failed to prove his defense of release.

---

[29] Because there was no evidence presented at trial of any payments on the Underlying Notes, no "remitting" of excess interest was required.

On December 15, 2006, Frieri delivered an executed general release in favor of Neves which provides in pertinent part that Frieri, on behalf of himself and all his "companies, businesses . . . and affiliates . . . remises, releases, acquits, satisfies, and forever discharges" Neves and his affiliates from all claims that the releasors "ever had, now has or hereafter can, shall, or may have . . . from the beginning of the world to the day of these presents." This release was executed and delivered on the same day that the Consolidated Note was executed and delivered. Neves argues that because the Release was executed on the same day as the Consolidated Note, it released the Consolidated Note. That argument is not supported by law or by the facts.

When parties modify or consolidate loans, it is not uncommon for the parties to exchange releases at the same time. Moreover, it is implausible that on the same day Neves entered into the Consolidated Note, he was released from the very obligations arising from that note. Moreover, both Neves and Frieri took actions subsequent to the execution of the release inconsistent with the position that Neves argued at trial. Frieri advanced the additional $1.5 million to Neves pursuant to the terms of the Consolidated Note three days *after* the Consolidated Note and the general release were executed. And, more significantly, Neves made a $33,000 interest payment on the Consolidated Note on February 1, 2007, which directly contradicts any claim that the obligation had been released at the same time it was made.[30]

Thus, I find that Neves failed to prove his affirmative defense of release based on the December 15, 2006 general release.

---

[30] Moreover, Neves' separate contention that the February Note was intended to cancel the Consolidated Note, although also not supported by any evidence, itself necessarily admits that the Consolidated Note was effective *after* December 15, 2006. Arturo Frieri also testified that at a November 2007 meeting between him and Neves in Miami, Neves acknowledged the outstanding "$10 million debt" under the promissory notes at issue in this case. The $10 million figure in the testimony had to include the Consolidated Note, without which the total debt between the Neves entities and the Frieri entities would be only $5.65 million.

Accordingly, the Plaintiffs are entitled to judgment on Count II of the Complaint.  As Neves has not disputed the amount owed under the Consolidated Note, judgment shall be entered in the amount of $8,384,113.01 which is principal and interest through April 21, 2014, plus interest accruing thereafter at a per diem at rate of $5339.21, plus reasonable attorney's fees and costs for which application must be made.

### C.    The February Note (Counts III, IV, and V)

Counts III, IV, and V of the Complaint relate to the February Note, pursuant to which the Plaintiffs claim that Neves owes $3 million in outstanding principal plus interest.  The Plaintiffs did not introduce the original of the February Note at trial but, rather, seek to reestablish the note, as they claim the February Note is lost. *See* Fla. Stat. §673.3091 (2010). In addition, the Plaintiffs seek to reform the February Note, which according to the Plaintiffs, does not reflect the parties' agreement, but rather, includes two scrivener's errors—accidental inclusion of two provisions purporting to cancel prior notes, mistakenly carried over from the Consolidated Note, which was used as a template for the February Note.

### i.    Reestablishment

Generally, a promissory note is a negotiable instrument. *See Perry v. Fairbanks Capital Corp.*, 888 So. 2d 725, 726 (Fla. 5th DCA 2004). A party suing on a promissory note "must therefore be in possession of the original of the note or reestablish the note pursuant to Fla. Stat. §673.3091." *Dasma Invs., LLC v. Realty Assocs. Fund III, L.P.*, 459 F. Supp. 2d 1294, 1302 (S.D. Fla. 2006).   Thus, if the holder of the note has lost the note, the holder may still enforce the note if the holder satisfies certain requirements, including proof of entitlement to collect, proof of the terms of the note, and proof that the maker of the note is adequately protected if the

original note should one day reappear.[31]  A party seeking to establish his entitlement to enforce a note is not required to prove how possession was lost or that it was in his actual possession prior to it being lost. *Deakter v. Menendez*, 830 So. 2d 124, 127-28 (Fla. 3d DCA 2002).

The Plaintiffs satisfied the statutory requirements to reestablish the February Note.  The evidence reflects that the Plaintiffs had previously been in possession of the February Note before it was lost, that they were unable to locate the February Note, and they have proven the terms of the February Note.  The parties agree that Neves gave the executed February Note to Markwood, whose principals are the same as those of Golden Dawn.  Arturo Frieri testified that the February Note was lost.  He testified that he keeps the records and assets for the Plaintiffs, that he conducted a search for the documents in Colombia, and that he instructed Frieri to search for the documents in Italy, but that all efforts to locate the original of the February Note were unsuccessful.  While Neves disputed that Arturo Frieri, rather than Frieri, had possession of the February Note, and was therefore unqualified to testify that the February Note was lost, I find that Arturo's testimony was sufficient.  Thus, the Plaintiffs had the right to enforce the February Note according to its terms before it was lost.  *See* Fla. Stat. §673.3011.

---

[31] *See* Fla. Stat. §673.3091 (2014):
> (1) A person not in possession of an instrument is entitled to enforce the instrument if:
>> (a) The person seeking to enforce the instrument was entitled to enforce the instrument when loss of possession occurred . . . ;
>> (b) The loss of possession was not the result of a transfer by the person or a lawful seizure; and
>> (c) The person cannot reasonably obtain possession of the instrument because . . . its whereabouts cannot be determined . . . .
> (2) A person seeking enforcement of an instrument under subsection (1) must prove the terms of the instrument and the person's right to enforce the instrument.  If that proof is made, s. 673.3081 applies to the case as if the person seeking enforcement had produced the instrument. The court may not enter judgment in favor of the person seeking enforcement unless it finds that the person required to pay the instrument is adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument. Adequate protection may be provided by any reasonable means.

The Plaintiffs proved the terms of the lost February Note at trial by introducing a true copy of the February Note.  *See Gutierrez v. Bermudez*, 540 So. 2d 888, 891 (Fla. 5th DCA 1989) (holding that copies of the original note and mortgage helped to establish the terms of the documents).  Neves acknowledges executing the February Note, and Frieri testified that the February Note remained unpaid.  Arturo Frieri testified that the February Note has not been transferred, has not been pledged as security, has not been assigned, has not been given to someone else or otherwise disposed of, and has not been lawfully seized.  Moreover, Golden Dawn is the only party to claim an interest or assert a right to enforce the February Note.  While Neves disputes Arturo Frieri's standing or knowledge to testify as to these matters, other than seeking to weaken Arturo's testimony, Neves offered no rebuttal evidence on any of these points.

Finally, the February Note matured on September 30, 2007, nearly seven years ago. Accordingly, an action to enforce the February Note is now barred by the statute of limitations,[32] which I find adequately protects Neves from a future claim seeking to enforce the instrument. *Accord Fifth Third Bank v. Alaedin & Majdi Invs., Inc.*, No. 8:11-CV-2206-T-17TBM, 2012 WL 1137104, at *3 (M.D. Fla. April 4, 2012) ("Though it has been suggested that what constitutes 'adequate protection' in lost instrument cases varies with the circumstances, there is nothing to say that "adequate protection" in the present circumstances would not require a bond to be posted until the statute of limitations has run.").  *Cf.* Fla. Stat. §702.11 (2014) ("Any security given [in connection with a mortgage foreclosure] shall be on terms and in amounts set by the court, for a time period through the running of the statute of limitations for enforcement of the underlying note . . . ").  Thus, the Plaintiffs have met their burden of proof required to reestablish the February Note pursuant to Fla. Stat. §673.3091 and judgment is granted in their favor as to Count III of the Complaint.

---

[32] *See* Fla. Stat. §95.11.

ii.    **Reformation**

The Plaintiffs do not wish to enforce the February Note as written, but rather, seek to reform the February Note to eliminate two provisions that the Plaintiffs argue were erroneously included by mutual mistake and do not accurately reflect the parties' intended agreement, as the provisions purport to cancel all prior promissory notes.  The first provision that the Plaintiffs seek to excise is: *"This Note consolidates, cancels, replaces and supersedes all previous Notes between the undersigned parties including, without limitation, those listed on Schedule 1 attached hereto ("Existing Notes"). The makers acknowledges* [sic] *that in consideration for converting such notes from demand notes into a single Promissory Note payable in accordance with the terms hereof that the Makers has* [sic] *agreed to the other changes contained within this Note."*

The second provision is: *"The undersigned hereby consents to the cancellation, replacement, consolidation of the Existing Notes."*

"A court of equity has the power to reform a written instrument where, due to mutual mistake, the instrument as drawn does not accurately express the true intention or agreement of the parties to the instrument." *BrandsMart U.S.A. of W. Palm Beach, Inc. v. DR Lakes, Inc*., 901 So. 2d 1004, 1005 (Fla. 4th DCA 2005) (quoting *USAA Cas. Ins. Co. v. Threadgill*, 729 So. 2d 476, 478 (Fla. 4th DCA 1999)).  "A mistake is mutual when the parties agree to one thing and then, due to either a scrivener's error or inadvertence, express something different in the written instrument." *Id*. at 1005–06 (quoting *Circle Mortg. Corp. v. Kline*, 645 So. 2d 75, 78 (Fla. 4th DCA 1994)).

The Plaintiffs have proven by clear and convincing evidence[33] that the February Note does not express the parties' intended agreement.  A review of the testimony of Frieri, Arturo Frieri, and Aguilera, as well as a comparison of the Consolidated Note with the February Note, supports the Plaintiffs' claim that the February Note mistakenly includes three unintended scrivener's errors resulting from cutting and pasting the provisions of the Consolidated Note to create the February Note.

Frieri testified that the parties did not intend the February Note to cancel any previous loans.  Neves at least indirectly admitted in November 2007 that the Consolidated Note was due and owing, so he clearly did not believe the February Note cancelled the Consolidated Note.

The Plaintiffs questioned Neves in detail about the circumstances surrounding the execution of the February Note, about whether he intended the February Note to cancel the Consolidated Note, and whether the provisions at issue were mistakenly included.  Neves invoked his Fifth Amendment privilege in response to every question relating to the February Note.[34]

The circumstances surrounding the drafting of the February Note further evidence a mutual mistake.  Aguilera was asked to draft the February Note.  Aguilera testified that Acosta sent her an email attaching a Word version copy of the Consolidated Note.[35]  Aguilera made changes to the Consolidated Note form and saved a new document that would later become the

---

[33] *In re United Tile & Stone, Inc*., 449 F. App'x 901, 906 (11th Cir. 2011) (quoting *BrandsMart U.S.A. of W. Palm Beach, Inc. v. Dr. Lakes, Inc.*, 901 So. 2d 1004, 1006 (Fla. 4th DCA 2005)).

[34] Based on the testimony of Aguilera, Frieri and Arturo Frieri, as well as comparison of the two notes, I find it is appropriate as to this issue to draw an adverse inference and to find that Neves did not intend the February Note to cancel the Consolidated Note.  *See RBS Citizens, NA v. M-59 Tel. Petroleum LLC*, No. 2:12-cv-11193, 2013 WL 4496248, at *5 (E.D. Mich. Aug. 21, 2013) (finding intent based on adverse inference).

[35] Acosta forwarded an email from Steve Mendelsohn that attached the Consolidated Note.  The evidence at trial was that Neves' lawyers, Steve Mendelsohn of Greenberg Traurig LLP, had drafted the earlier Consolidated Note.

February Note.[36]  That document "drafted" by Aguilera was then signed by Frieri and Neves and given to Markwood by Neves.  It is readily apparent that the Consolidated Note served as the starting point for the February Note when the February Note is compared with the Consolidated Note, as the February Note has provisions identical to the Consolidated Note.  For example, the paragraph that the Plaintiffs seek to excise from the February Note was copied and pasted from the Consolidated Note—the words, font, and even spacing are identical.  The entire paragraph that precedes the paragraph that the Plaintiffs are seeking to remove was also copied and pasted, word for word, from the Consolidated Note.  Both paragraphs even include the same grammatical errors as the Consolidated Note (e.g. "the Makers acknowledges"; "Makers agrees").

Moreover, the provisions of the February Note that the Plaintiffs seek to strike reflect that there is no mutual understanding of the parties.  The February Note includes from the Consolidated Note, in the paragraph the Plaintiffs seek to remove, recitations that the note is an aggregation of prior notes and acknowledges the conversion of demand notes to a term note as consideration.  In addition, the February Note states that it cancels those prior notes and refers to a "Schedule I" listing the notes that are cancelled.  There is no evidence of a Schedule I or that the February Note consolidated prior demand notes into a term note.[37]

In addition, the sentence on page 3 of the February Note above Frieri's signature line - "*The undersigned hereby consents to the cancellation, replacement [and] consolidation of the Existing Notes*" - was also copied and pasted wholesale from the Consolidated Note, including

---

[36] On cross-examination, Neves challenged Ms. Aguilera's testimony concerning her role in drafting the February Note.  At a deposition in 2009, Ms. Aguilera testified that she did not have a role in drafting the document.  At trial, however, Ms. Aguilera explained that she had not been shown the emails reflecting that she drafted the document and that those emails reminded her of that fact.   Ms. Aguilera was credible on this point, which was supported by other evidence.

[37] *See* ECF #31 (main proceeding), p. 57.

the omission of the word "and."  Finally, there is no evidence in the record that there was any consideration to cancel the Consolidated Note—certainly no such consideration appears in the February Note.[38]

The Plaintiffs have proven that the parties did not intend the February Note to cancel the Consolidated Note and have proven that the cancellation provisions in the February Note were included by mutual mistake.[39]  Accordingly, judgment is entered in favor of the Plaintiffs on Count IV of the Complaint, and the mistaken provisions are excised and of no force or effect.

### iii.     Enforcement of the February Note.

The Plaintiffs are entitled to enforce the February Note according to its terms, as modified, and to recover from Neves thereunder.

The Plaintiffs have proven that Neves breached the terms of the February Note by failing to make interest payments when due, and by not paying the Plaintiffs the outstanding principal amount of $3 million on the maturity date of September 30, 2007.  The Plaintiffs are therefore entitled to judgment in their favor on Count V of the Complaint.  There does not seem to be a dispute as to the amounts owed; accordingly, judgment shall be entered in the amount of $5,409,028.79 in principal and interest through April 21, 2014, plus interest accruing thereafter at a per diem rate of $3,503.76, plus reasonable attorney's fees and costs for which application must be made.

---

[38] The Consolidated Note for $4.43 million had not been paid except for a $33,000 interest payment in February. The $3 million loan evidenced by the February Note would not be adequate to pay off the Consolidated Note, and nothing in the February Note references an agreement to reduce the payment due under the Consolidated Note. Moreover, upon execution of the February Note Golden Dawn advanced to Neves and Acosta Realty an *additional* $3 million, which advance would not be consistent with consolidation of prior notes for which funding had already occurred.

[39] As a consequence of this holding, I also find that Neves has failed to prove his affirmative defense that the Consolidated Note was released pursuant to the terms of the February Note.

## RULE 15 AND AMENDING THE PLEADINGS

Before turning to the fraud and conspiracy portion of the trial, I must first address the Plaintiffs' request to amend the pleadings to conform to the evidence.[40]  This request is two-fold.  First, the Plaintiffs seek to amend the pleadings to add a separate conspiracy count.  Second, the Plaintiffs seek to amend the pleadings to include a significant amount of additional facts relating to fraud and conspiracy, the introduction of which Neves repeatedly objected to both prior to, and during the entirety of, the trial.[41]

Rule 15(b) of the Federal Rules of Civil Procedure sets forth the framework under which the Plaintiffs' request must be considered:

> If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended.  The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits.

Thus, for purposes of Rule 15(b)(1),[42] I must determine whether amendment of the Complaint and admission of the additional facts would prejudice Neves.[43]  *See Harris v. Garner,* 216 F.3d 970, 996 (11th Cir. 2000).  *See also Brandon v. Holt,* 469 U.S. 464, 472 n. 19 (1985) ("Rule 15(b) amendment allowed 'so long as the opposing party has not been prejudiced in presenting his case' . . . Rule 15(b) is 'intended to promote the objective of deciding cases on their merits

---

[40] *See* ECF #952.

[41] *See* Joint Pretrial Order, ECF #917, n. 1.

[42] If the issues are tried by express or implied consent, Rule 15(b)(2) requires that the pleadings be deemed amended.  This portion of the rule is not relevant to Plaintiffs' requested amendment.

[43] In his objection to Plaintiffs' Rule 15 Motion, Neves relied on the criteria for post-trial amendment set forth by the Supreme Court in *Foman v. Davis,* 371 U.S. 178, 182 (1962), in which the Supreme Court held:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'

However, the Supreme Court referred to an earlier version of Federal Rule of Civil Procedure 15, which required that post-trial amendments should be granted freely "when justice so requires."  Under the amendments to Rule 15 adopted subsequent to 1963, the "when justice so requires" standard only applies to amendments sought *prior* to the start of trial.

24

rather than in terms of the relative pleading skills of counsel'. . . '[C]ourts should interpret [Rule 15(b) ] liberally and permit an amendment whenever doing so will effectuate the underlying purpose of the rule'") (citations omitted).

In order to present a claim for conspiracy, the plaintiff must allege both the conspiracy and the underlying wrongful act. *See Am. United Life Ins. Co. v. Martinez,* 480 F.3d 1043, 1067 (11th Cir. 2007). In this case the alleged underlying wrongful act is fraud.

> The elements that a plaintiff must allege for a conspiracy claim are that 1) two or more parties 2) agree 3) to commit an unlawful act. Under Florida law, the 'gist of a civil conspiracy is not the conspiracy itself but the civil wrong which is done through the conspiracy which results in injury to the Plaintiff.' . . .Thus, as this Court has noted, a claim that is found not to be actionable cannot serve as the basis for a conspiracy claim.

*Id*. (citations omitted). Describing Florida conspiracy law in more detail, Judge Robin Rosenbaum wrote, "Civil conspiracy in Florida includes four elements: 1) an agreement between two or more parties; 2) to do an unlawful act or to do a lawful act by unlawful means; 3) where some overt act in performed in pursuance of the conspiracy; and 4) damage to the plaintiff results from the acts done under the conspiracy." *Democratic Republic of the Congo v. Air Capital Group, LLC.*, 2103 WL 3223688, at * 4 (S.D. Fla. June 24, 2013) .

Neves has failed to show that he is prejudiced by adding a separate count for conspiracy.[44] Although the Complaint does not include a separate conspiracy count, Neves was fully aware that the Plaintiffs were relying on conspiracy as their primary theory of recovery against Neves. Setting aside for a moment the lack of preciseness with which the conspiracy and fraud allegations were plead,[45] the Complaint includes many separate allegations relating to the

---

[44] Plaintiffs submit that they proved all the elements of conspiracy at trial. Whether or not Plaintiffs were successful in their proof, because Plaintiffs failed to prove the underlying wrong, I will not need to reach the adequacy of proof of the conspiracy claim.
[45] The operative complaint, the Fourth Amended Complaint, was Plaintiffs' fifth and final opportunity to plead. Nonetheless, Neves repeatedly sought dismissal of each iteration of the Complaint after his discharge was waived on

conspiracy claim, which collectively covered all four elements required—agreement, unlawful act, overt act and damages.[46]  In addition, the Joint Pretrial Order listed as disputed issues of fact several facts that refer to conspiracy, schemes to defraud by multiple persons, and co-conspirators.[47]  Moreover, the addition of a separate conspiracy count does not add a new cause of action because conspiracy was raised as a basis for relief in the Complaint.  Consequently, whether the Plaintiffs should have originally pled conspiracy as a separate count or was able to include the conspiracy allegations as part of the fraud count,[48] I hold that the Plaintiffs may add a separate conspiracy count after trial.

I now turn to Neves' objection to the addition of any facts not specifically plead in the Complaint that relate to the alleged fraud.  The Complaint contains many allegations relating to fraudulent misrepresentations; however, in some instances the alleged fraudulent misrepresentations were not specifically described and in other instances the person or persons who made the misrepresentations were not specifically described.  Some of the proposed additional facts to which Neves objects were, in fact, included in the Complaint (for example, the allegation that the $20 million was transferred out at Neves' instruction).  Moreover, the prejudice that Neves claims he will suffer if I admit the "Rule 15 evidence" is the inability to conduct discovery on these issues, but Neves had full notice of the general facts relating to the fraud and conspiracy claims (with just a few exceptions) and could have asked questions relating to those more general allegations.  In other words, with respect to much of the "Rule 15 evidence," Neves had specific enough notice to conduct discovery on these allegations.

---

the basis that I did not have jurisdiction.  Thus, in an effort to move litigation forward, and to avoid repeating my ruling on jurisdiction for the third or fourth time, I ordered Neves to answer the Complaint, which he did.

[46] *See, e.g.*, ECF #917, ¶¶ 64, 74, 84, 86, 91, 92, 94, 109, 114–19.

[47] *Id.* at ¶¶ 46, 57.

[48] Plaintiffs sought to add a separate count for conspiracy when, after reviewing *Marlborough Holdings Group, Ltd. v. Azimut-Benetti, et al.,* 505 Fed. Appx. 899 (11th Cir. 2004), I questioned whether a separate count was required.  In *Marlborough* the Eleventh Circuit held that, under applicable pleading standards, conspiracy had to be pled in a separate count.

The most specific concern raised by Neves in his Closing relates to what Neves describes as a "new misrepresentation."  The Complaint alleges that Fuenmayor and Lovera instructed Frieri to wire $20 million into an ECG account at HSBC and also that the funds would be initially deposited into a new HSBC account in the name of Markwood.  These are the same misrepresentations that are described in the Joint Pretrial Order (including those sections of the Joint Pretrial Order that consist of the "disputed" disputed facts).[49]  What first appears in the Plaintiffs' Closing is a new alleged misrepresentation to which Neves takes exception, which misrepresentation is that Fuenmayor and Lovera told Frieri that the money needed to be put up in an account to show four banks, supposedly the owners of ECG, that Frieri had the capital to invest in additional PDVSA deals. [50]  As Neves points out in his closing argument, the Plaintiffs did not ask in their Rule 15 Motion that this alleged misrepresentation be considered as part of the evidence in support of the fraud and conspiracy claims.  Accordingly, I will not consider this alleged misrepresentation in rendering my decision, although I will address it for purposes of completeness.  In all other respects, the Plaintiffs' Motion is granted.

**FRAUD AND CONSPIRACY TO COMMIT FRAUD**

In order to prove a claim based on fraud, the Plaintiffs were required to prove all of the following: "'(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induced another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation.'" *Butler v. Yusem*,

---

[49] There are eight paragraphs of Disputed Facts unilaterally included by Plaintiffs in the Joint Pre-Trial Order which were objected to by Neves based on Rule 15.  Neves also included some disputed facts and issues, to which Plaintiffs raised relevancy objections.

[50] Frieri did testify about four banks in his deposition testimony, but as I will address in more detail later, his testimony about the four banks shows his own confusion about how those four banks related to this September transaction.

44 So. 3d 102, 105 (Fla. 2010) (citation omitted).  However "[j]ustifiable reliance is not a necessary element of fraudulent misrepresentation." *Id.*

In support of the fraud claim, the Plaintiffs alleged that: (1) Luna introduced Frieri to Lovera and Fuenmayor; (2) that Lovera and Fuenmayor lured Frieri into a false sense of security with the April Bait Transaction in order to get Freiri to provide more money for the next transaction—the $20 million—in order to steal the money; (3) that Lovera and Fuenmayor told Frieri to wire $20 million into an ECG account at HSBC/Panama to be credited to Markwood; (3) that Lovera and Fuenmayor told Frieri that the money would be placed into a Markwood account at HSBC/Panama; (4) that ECG was formed solely for the purpose of taking this money from Markwood; and (5) that Acosta then took all of the money out of the ECG account, transferring $8.5 million to Acosta Realty, $1.4 million to an ECG Account that was ultimately opened at LatAm, and the balance to four banks,[51] thereby causing the loss and damages to the Plaintiffs.  The Plaintiffs further allege that all of this was masterminded by Neves.

The Plaintiffs' burden of proof as to the fraud is by a preponderance of the evidence.[52]

While Luna did in fact introduce Lovera and Fuenmayor to Frieri, the evidence shows that the Luna introduction was not the first time Frieri had been introduced to BancTrust.  A March 12, 2006 email from Aguilera to Frieri describes BancTrust as an agent of LatAm (then known as Acosta Financial) and even attaches to that email a copy of the BancTrust Agreement with Acosta Financial, albeit unsigned.  So, it appears that the Luna introduction was for purposes of the PDVSA deal opportunity.  The relationship between Lovera and Fuenmayor and LatAm was not concealed.  Frieri was fully aware of the relationship between BancTrust, Lovera and Fuenmayor on the one hand, and LatAm, Jimmy Acosta, and Neves on the other, long before

---

[51] Banco Canarias, Arbitrajes Financieros, Ontime Financial Services, and Atlantic Corporate Services.
[52] *Wieczoreck v. H & H Builders, Inc.,* 475 So. 2d 227 (Fla. 1985); *In re Bilzerian,* 100 F.3d 886 (11th Cir. 1996)

the events of April 2007 and thereafter. Thus, the existence of this relationship does not independently corroborate any inference to be otherwise made from Neves' silence in the face of questions that this introduction was made solely to defraud Frieri, Markwood and Golden Dawn.

The Plaintiffs have also failed to prove that ECG was created for the purpose of defrauding Frieri. The evidence shows that steps to form ECG began in early April 2007, around the time the April Bait Transaction took place. It is clear that, notwithstanding Acosta's testimony to the contrary, Neves had some interest in ECG.[53] Neves clearly knew ECG was being formed. Aguilera testified that Neves approved expenses relating to the formation of ECG and both Aguilera and Luna testified that Neves flew to Panama (Aguilera testified this was in September) to locate a corporate apartment for ECG. Additionally, Neves was copied on at least a couple of emails referencing the formation of ECG, although there is no evidence that he was actively involved in these discussions; indeed he was not copied on reply emails.

However, the evidence also shows that Acosta, Leandro Ecker,[54] and Alicia Aguilera, went through time consuming and lengthy efforts to get the ECG entity formed and approved to conduct business in Panama, all of which was done through the efforts of a corporate attorney. A Business Plan and a comprehensive Anti-Money Laundering Plan were adopted. Moreover, Acosta, Leandro Ecker and Alicia Aguilera continued with all efforts to launch ECG for business in Panama, including, apparently, reaching out to Bloomberg for web access, even after the $20 million was transferred.[55] Alicia Aguilera also testified that the purpose of forming ECG was to

---

[53] Most of the evidence on which Plaintiffs rely to prove Neves' involvement with ECG is either exaggerated or purely speculative. The quality of this evidence, even coupled with any adverse inference to which Plaintiffs might otherwise be entitled from that small amount of evidence that is adequate to support an inference, is not enough to prove otherwise. Nonetheless, there is evidence both from Luna and Aguilera that Neves was involved in the formation of ECG, even though there is no evidence whatsoever that he was an owner of, or had any direct financial interest in, the entity.

[54] A broker at LatAm.

[55] Because the Bloomberg agreements introduced into evidence were unsigned, I have not put much weight on these agreements, but there was no suggestion that the agreements were forgeries.

provide better service for clients of Neves and Leandro Ecker located in Latin America—in other words, for a legitimate business reason.  Thus, while ECG may ultimately have been the vehicle through which Acosta and Neves obtained a portion of Markwood's money, the Plaintiffs have failed to prove that ECG was created for that purpose,[56] notwithstanding Neves' silence in the face of questions directed to his having formed ECG for the sole purpose of cheating the Plaintiffs  out of the $20 million.[57]

I also find that the Plaintiffs have failed to prove that the April Bait Transaction was, in fact, a bait transaction designed solely to lure Frieri into making the second transaction.  While Fuenmayor and Lovera may have introduced Frieri to the PDVSA transactions, Frieri, a very sophisticated and astute businessman, was integral in trying to get other investors involved and garnering interest in this form of investment vehicle.  Moreover, the evidence also shows that Frieri was very involved in trying to put together subsequent PDVSA deals including the $20 million September deal.  Frieri wanted to do more PDVSA deals and the $20 million deal was apparently only the next step in what Frieri clearly believed would be many future profitable investments in these PDVSA.[58]  The Plaintiffs acknowledge that Frieri invited LatM to be part of the initial "April Bait Transaction" and that LatAm declined, citing to the riskiness of the

---

[56] While Markwood asked Neves questions regarding the formation of ECG which Neves refused to answer, the independent evidence, even in light of Acosta's denial of Neves' involvement in ECG, contradicts, rather than corroborates, any adverse inference sought by Plaintiffs with respect to this issue.  Moreover, there is no reason why, if there had been a plan to defraud Frieri, ECG would need to be set up.  Neves had demonstrated he knew how to get money from Frieri, because Neves or his entities had taken millions of dollars from Plaintiffs by executing promissory notes that remain unpaid.

[57] It is possible that Frieri did in fact know that ECG was connected to this same group and with LatAm, and, in fact, was being created to reduce commissions and costs for Latin America transactions,  and, it is even possible that Frieri might have expressed some interest at some point in getting involved in ECG.  Not only did Frieri try, unsuccessfully, to buy into Acosta Financial, but Frieri's emails to Aguilera indicate that around the Spring of April 2007, Frieri was trying to set up a broker dealer in Panama.  It is not necessary, however, to my ruling, to decide these particular facts.

[58] Indeed, the parties stipulated that, after the $20 million was wired, but before Frieri discovered the money was missing, he wired more money at Fuenmayor's instruction to fund another PDVSA deal.

transaction.[59]  The Plaintiffs claim that LatAm's refusal to participate because of the risky nature of the transaction was merely part of the plan to lure Frieri into a false sense of security.[60]  There is nothing to support this allegation and I will not use the adverse inference to overcome the total lack of evidence to support this allegation.

The Plaintiffs have also failed to prove that Fuenmayor and Lovera misrepresented anything because, to the extent that they gave Frieri information regarding events that then did not occur, there is no proof that either Fuenmayor or Lovera believed or knew that the information was untrue at the time the statements were made.

The first misrepresentation alleged in the Complaint is that Lovera or Fuenmayor told Frieri the $20 million would be wired into a Markwood account at HSBC/Panama.  However, the evidence shows that Frieri knew the $20 million was being wired into an account in the name of Emerging Capital Group.  While the reference on the wire instructions did state "Markwood Account Opening," there is no question that the wire instructions clearly indicated that the funds were being wired into an account in the name of Emerging Capital Group.  Thus, there was no misrepresentation about where the money was going first.

The other alleged misrepresentation set forth in the Complaint and the Joint Pretrial Order is that Fuenmayor and Lovera told Frieri that the money would be placed into a Markwood account at HSBC/Panama.  Frieri's testimony was confusing on this point.  He initially testified he was told the money was going directly into a separate Markwood account.  It is clear that is not the case—he knew the money was going into an ECG account.  Thus, it appears that Frieri

---

[59] Neves claims that the PDVSA transactions were illegal because the position Frieri took could only be held by a Venezuelan citizen.  Whether or not the PDVSA transactions were illegal, they were, undisputedly, high risk, albeit apparently extremely profitable, investments.

[60] Other alleged "lures" were equally incredible—Frieri speculated that Neves' decision to intercede when Acosta physically threatened Frieri, and Frieri's brief affair with Aguilera, were also designed solely to make Frieri believe that Neves was his friend, and in furtherance of the fraud.  There is no support for this conjecture, and, indeed, Aguilera's testimony contradicts Frieri's theories.

"mis-remembered" what he was told about where the money would be sent—that is, a separate Markwood account at HSBC/Panama as opposed to a separate account in the name of Markwood held at ECG, into whose HSBC/Panama account the money was being wired.  There is no evidence, and Frieri did not testify, that Frieri was asked to complete, or in fact, did complete, the paperwork that would have been necessary for him to sign in order to open a separate bank account for Markwood.

Moreover, even assuming this representation was made, that is, that after the money was sent to ECG it would then be transferred to a separate Markwood bank account, there is no evidence that this representation was actually false at the time it was made, or that Fuenmayor or Lovera thought it was false when it was made.  Fraud cannot be based "on a promise or a prediction of future events."  *Zarella v. Pacific Life Ins. Co*., 755 Supp. 2d 1231, 1237 (S.D. Fla. 2011).  *See Mejia v. Jurich*, 781 So. 2d 1175, 1177 (Fla. 3d DCA 2001) ("An action for fraud generally may not be predicated on statements of opinion or promises of future action, but rather must be based on a statement concerning a past or existing fact").  Under Florida law, the only exception to this general rule is when "the person expressing the opinion is one having superior knowledge of the subject of the statement and the plaintiff can show that the said person knew or should have known from facts in his or her possession that the statement was false."  *Id.*  There is absolutely no evidence that Fuenmayor or Lovera had or would have had knowledge superior to Frieri's if and when an actual Markwood account would be opened, because, as I already stated, there is no evidence that Frieri was asked to complete, or in fact, did complete, the paperwork that would have been necessary for him to sign in order to open a separate bank account.

In their Closing, the Plaintiffs also argue that Fuenmayor and Lovera told Frieri that they would form a company to do these PDVSA deals.  Frieri testified that Fuenmayor and Lovera

told him that they are going to put together a company that would hopefully include financing from four banks and the $20 million would be used to show these banks Frieri had the money for such a project—to "convince the Venezuelan banks also to input their own resources." It is clear from Frieri's testimony that the formation of this investment company was, at best, in a nascent development stage. While at times during his testimony Frieri seems to suggest ECG was this supposed entity, his testimony makes clear that he knew this money was being wired in connection with an entity to be formed, rather than one already formed, and that ECG was not that investment vehicle and was not owned by the four banks.[61] Frieri never identified who those four banks were; in fact, he testified that the identity of the four banks was never disclosed to him.[62]

Frieri testified that he would never have wired the money if he knew who were the principals of ECG, but it is unclear why that would be true. Frieri knew that Lovera and Fuenmayor had a relationship with LatAm, Neves and Acosta. Moreover, while tense, Frieri had at least a cordial relationship with Aguilera, as evidenced by the many emails they exchanged during this time period. Thus, there is no logical reason why Frieri would have not wired the funds into an ECG account just because the company was owned by Acosta, Ecker and Alicia Aguilera. Even if this testimony was believable, it is not relevant to the issues litigated, and consideration of this alleged misrepresentation was not included in the Rule 15 Motion.

---

[61] This last fact, relating to the ownership of ECG, was neither plead in the Complaint nor included in the Joint Pretrial Order.

[62] Neves points out that Frieri's own investment advisor, Carlos Abadi, told Frieri he needed to know the name of these four banks in order to comply with United States Patriot Act laws. Neves argues that Frieri's deliberate ignorance illustrates that, even if any misrepresentation regarding the four banks was made by Fuenmayor or Lovera to Frieri, it is clear that Frieri did not rely on that misrepresentation. However, it is not necessary for me to reach the issue of reliance.

The Plaintiffs have argued that Neves instructed Lovera or Fuenmayor to make these misrepresentations[63] and therefore, by virtue of the alleged conspiracy, the misrepresentations should be imputed to Neves.  Because the Plaintiffs have failed to prove there was any misrepresentation, the Plaintiffs have failed to prove fraud.  Because the Plaintiffs have failed to prove fraud, I do not need to address whether the Plaintiffs proved the existence of a conspiracy.[64]  Consequently, the Plaintiffs may not impute any of Lovera's or Fuenmayor's alleged misrepresentations to Neves, and moreover, the Plaintiffs have failed to prove there were any misrepresentations to impute to Neves.[65]  Indeed, it is clear from Frieri's deposition testimony that the entire fraud theory is based on speculation by Frieri that somehow Neves *had* to be the one that set everything up.  Frieri acknowledges that there is no proof that Neves was involved in any scheme.  And Frieri is correct; the evidence presented at trial did not prove that Frieri's theory was more than what he acknowledged in his deposition—pure speculation.  Thus, the Plaintiffs have failed to prove their fraud claim.

The last element the Plaintiffs must prove is damages.  Because the Plaintiffs have failed to prove fraud, the damages that they have proven are not recoverable.  Nonetheless, I will address the damages proof for reasons that will become clear.

The Plaintiffs claim that Neves took the entire $20 million, however, they have only proven that Neves took $8.5 million of the $20 million.  The evidence shows that $10 million of

---

[63] It is also significant that Frieri testified Lovera and Fuenmayor told him that neither had spoken to Neves and that they had been "tricked" by Neves and Acosta.  There is absolutely no evidence that suggests Neves ever spoke with Fuenmayor and Lovera, about this or any other transaction, and in the absence of any evidence that is not either speculative or contradicting, I will not apply the adverse inference to questions related to this topic that would suggest the contrary.

[64] Thus, there is no need for me to review the evidence that Plaintiffs allege would support the existence of a conspiracy, including payments over the period of a year from Neves to Acosta and Luna or to address the pleading inadequacies of the Complaint.

[65] There is an unexplained $250,000 payment to Lovera from Neves' personal account after the $20 million was wired.  While Neves was in the habit of making payments to Luna and Acosta from his personal account, there is no evidence that he did so with Lovera.  This payment, together with the negative inference, indicates some complicity by Lovera in the $8.5 million diverted to Neves, but this is not enough to support the fraud claim.

the $20 million was wired out to four entities[66] three of whom were involved in the April Bait Transaction, from which transaction Frieri made a profit of approximately $5 million in approximately 15 days.  There is no evidence that Neves, or any of the persons named in the Complaint, wrongfully took that $10 million, although Acosta, most of whose testimony was unbelievable, testified he wired the $10 million to these entities at Frieri's instruction.[67]  It is also undisputed that approximately three weeks after the $20 million was wired into the ECG, $8.5 million was wired to Acosta Realty and $1.4 million was wired to an ECG account in New York (ultimately making its way to an ECG account at LatAm managed by Neves).  Further, the evidence shows that after Acosta Realty received the $8.5 million, $1.3 million of that was transferred Acosta and $700,000 was given to J & A Boynton Enterprises, a company undisputedly owned and controlled by Acosta. There is absolutely no credible explanation whatsoever, why the $8.5 million was sent to Acosta Realty.  Acosta's testimony that Frieri had agreed to invest the $20 million in ECG, and Acosta's incredible testimony about the $10 million, and how it was going to turn into $18.5 million, is just not believable; moreover, it is belied by ECG's Business Plan where the initial capitalization for ECG was described as $1 million and never described Markwood or Frieri as a source of potential funding.

Thus, considering all of the evidence, I find that the Plaintiffs have failed to prove that there was a scheme to defraud Markwood, Golden Dawn or Frieri out of $20 million, or that from any scheme, even if proven, that the damages would have been more than $10 million.

However, although the Plaintiffs have failed to prove fraud, there is no question that the Plaintiffs, without reliance on the "Rule 15 evidence" have proven that at least $10 million of the

---

[66] Banco Canarias, Arbitrajes Financieros, Ontime Financial Services, and Atlantic Corporate Services.  *See* Joint Pretrial Order ¶42.  Three of these four entities collectively received wired funds of $11.75 million as part of the April Bait Transaction.  *See* Joint Pretrial Order ¶39.

[67] This may or may not be true.  There is not enough evidence to prove this $10 million was misappropriated, especially because these four entities had been involved in the prior, extremely profitable, deal.

$20 million was stolen, and that Neves is responsible for $8.5 million of those stolen funds. The Plaintiffs have proven that the $8.5 million was sent to Acosta Realty.[68] The Plaintiffs have also proven these transfers were never authorized, and that the Plaintiffs wanted that money back. The evidence proves that Neves knew that his keeping the $8.5 million (the $6.5 he kept and the $2 million he returned to Jimmy Acosta) was wrongful, and indeed, other than Acosta's remarkable story, there is absolutely no explanation why Neves received the money or why Neves kept the money.[69] This evidence, combined with Neves' refusal to answer questions about his intention to steal the money (and the consequent adverse inference arising from his assertion of the Fifth Amendment), clearly support a finding, and I find, that Neves knowingly kept money that was wrongfully taken by Acosta, whether or not Neves was involved in the original plan to steal the money.[70] But the Plaintiffs have not sought recovery based on theft; had they done so there is ample evidence for me to have found that Neves was involved in the theft of at least $8.5 million of the $10 million, whether by embezzlement or larceny.[71]

Accordingly, judgment is entered in favor of Neves on Count I of the Complaint.

---

[68] Acosta testified that $10 million of the $20 million was Markwood's "investment" in ECG, so I find the source of the $8.5 million was Markwood's money.

[69] The evidence shows that Neves met with Arturo Frieri to discuss recovery of the $20 million, during which meeting Neves never mentioned that he had almost 40% of the missing money. However, even without this "Rule 15 evidence," the evidence that Neves was involved in the theft of the funds is overwhelming and uncontradicted. Nonetheless, it appears that Neves would ask me to completely ignore the fact that $8.5 million made its way into the Acosta Realty account.

[70] Acosta filed a proof of claim in the Neves bankruptcy case, which states that the $8.5 million was a loan to Neves from ECG. However, Acosta could not credibly explain why a supposed investment to capitalize ECG went into the Acosta Realty account instead, as a loan or otherwise, or why $2 million came right back to him.

[71] For whatever reason, Plaintiffs did not seek recovery for theft and I cannot *sua sponte* grant relief that was not requested. *Wagner v. Daewoo Heavy Industries Am. Corp.*, 314 F.3d 541 (11th Cir. 2002) (en banc).

**CONCLUSION**

Thus, after four years and five versions of a complaint, the Plaintiffs have had the opportunity to present their case and Neves his opportunity to prove the Plaintiffs have no case. Neither was entirely successful.  Judgment is entered in favor of the Plaintiffs on Counts II, III, IV and V of the Fourth Amended Complaint, and judgment is entered in favor of Defendant on Counts I and VI of the Complaint.

Plaintiffs shall submit an accounting of accrued interest after April 21, 2014 and the attorney fee and costs awarded in accordance with Counts II and V of the Complaint, within 14 days of entry of this Opinion.  Neves shall then have 14 days to file any objection he may have either to the interest calculation or the attorney fees and costs.

# # #

Copies furnished to:
Joanne Gelfand, Esq.
Brett Barfield, Esq.
Raul Espinoza, Esq.

*Attorney Espinoza shall serve a conformed copy of this order upon all parties in interest and shall file a Certificate of Service of same with the Clerk of the Court.*